UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.:   3:24-CR-113-TAV-JEM |
| | ) | |
| TIFFANY HANEY, ANNE WARREN, | ) | |
| and TINA ROPER | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This criminal matter is before the Court for consideration of the Report and Recommendation ("R&R") entered by United States Magistrate Judge Jill E. McCook on October 21, 2025 [Doc. 204], recommending that the Court grant Defendant Anne Warren's and Defendant Tiffany Haney's motions to join [Docs. 96, 172, 177], deny Defendant Tina Roper's motion to join [Doc. 138], and deny the motions to suppress evidence [Docs. 89, 165]. The government filed objections to the R&R [Doc. 211]. Defendant Haney also filed objections to the R&R [Doc. 212], and Defendant Roper and Defendant Warren have moved to adopt those objections [Docs. 215, 221]. The government filed a response to Defendant Haney's objections [Doc. 234]. Thus, the matter is now ripe for review. *See* E.D. Tenn. L.R. 7.1(a).

As a preliminary matter, the Court **GRANTS** defendants' motion to file documents relating to their objections under seal [Doc. 213], and the proposed sealed documents [Docs. 214, 214-1, 214-2] shall be filed under seal. Additionally, for the reasons below, Defendant Warren and Defendant Roper's motions to join Defendant Haney's objections

[Docs. 215, 221] are **GRANTED**, but both Defendant Haney's and the government's objections to the R&R [Docs. 211, 212] are **OVERRULED**. The Court **ACCEPTS** and **ADOPTS** the R&R [Doc. 204] in whole, **GRANTS** Defendant Warren's and Defendant Haney's motions to join [Docs. 96, 172, 177], **DENIES** Defendant Roper's motion to join [Doc. 138], and **DENIES** the motions to suppress evidence [Docs. 89, 165].

## I.    Background

The Court presumes familiarity with the summary of the evidence and findings of fact as set forth in the R&R. Accordingly, the Court incorporates the background contained in the R&R [Doc. 204, pp. 4–36] into this memorandum opinion and order.

## II.    Standard of Review

The Court reviews *de novo* those portions of the R&R to which a party has objected. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). Accordingly, the Court considers defendants' motions, the government's responses, the R&R, the objections, and the responses thereto, all in light of the applicable law.

Objections to any part of a magistrate judge's disposition "must be clear enough to enable the district court to discern those issues that are dispositive and contentious." *See Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995); *see also Thomas v. Arn*, 474 U.S. 140, 147 (1985) (stating that the purpose of the rule is to "focus attention on those issues . . . that are at the heart of the parties' dispute"). Each objection to a magistrate judge's recommendation should describe how the analysis is wrong, why it was wrong, and how *de novo* review warrants a different result on a particular issue. *See Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). A general objection that

2

merely restates an argument previously presented or simply voices a disagreement with a magistrate judge's suggested resolution "has the same effect[] as would a failure to object." *Austin v. Comm'r of Soc. Sec.*, No. 1:19-cv-2380, 2021 WL 1540389, at \*4 (N.D. Ohio, Apr. 19, 2021) (citation omitted); *see also United States v. Dawson*, No. 4:19-cr-206, 2020 WL 109137, at \*1 (N.D. Ohio, Jan. 9, 2020) (citations omitted) ("[T]he Court is under no obligation to review *de novo* objections that are merely an attempt to have the district court reexamine the same arguments set forth in the petition and briefs.").

## III. Analysis

### A. *Franks* Challenge

When a defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). Under *Franks*, the defendant must (1) make a substantial preliminary showing that specified portions of the affiant's statements are deliberately or recklessly false, and (2) demonstrate that the challenged statements are necessary to a finding of probable cause. *Id*. at 171; *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001). Allegations of deliberate falsehood or reckless disregard for the truth must be accompanied by an offer of proof, and allegations of negligence or innocent mistake are insufficient. *Franks*, 438 U.S. at 171.

### 1. "Intent to Mislead" Standard

In discussing the legal framework for analysis of *Franks* challenges, the R&R states:

3

Omissions, too, can form the basis for a *Franks* challenge, but "an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Adkins*, 107 F.3d 1213, 1217 (6th Cir. 1997) (citation omitted). This is because an affidavit need not include all facts gathered over the course of an investigation. *Id*. Thus, "except in the *very* rare case where the defendant makes a strong preliminary showing that the affiant *with an intention to mislead* excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, *Franks* is inapplicable to the omission of disputed facts." *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998).

A heightened standard is necessary for omissions to foreclose "'endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit.'" *United States v. Martin*, 920 F.2d 393, 398 (6th Cir. 1990) (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)); *see also United States v. Hanna*, 661 F.3d 271, 285 (6th Cir. 2011) (affirming the district judge's observation that when omissions are at issue, "'additional hurdles must be met'"). "If the defendant does succeed in making a preliminary showing that the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit, the court must then consider the affidavit including the omitted portions and determine whether probable cause still exists." *Adkins*, 107 F.3d at 1217 (citation omitted).

[Doc. 204, pp. 47–48]. Later in the analysis, the magistrate judge reiterated:

As discussed above, the bar is higher for a defendant to make a substantial preliminary showing for an omission than for a false statement. *Martin*, 920 F.2d at 398. "[T]o . . . require that all potentially exculpatory evidence be included in an affidavit, places an extraordinary burden on law enforcement officers, compelling them to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded." *Mays*, 134 F.3d at 816. Thus, an affiant need not include "all potentially exculpatory information . . . in the search warrant affidavit." *United States v. Sample*, No. 11–20386, 2012 WL 71588, at *5 (E.D. Mich. Mar. 6, 2012).

[*Id*. at 53–54 (footnote omitted)].

Defendants assert that the magistrate judge misinterpreted dicta in *Mays*, 134 F.3d at 816, to hold that omissions require movants to satisfy a heightened "intent to mislead" standard [Doc. 212, p. 1]. Defendants contend that this legal error in the Sixth Circuit finds its genesis in *Mays*, but subsequent Sixth Circuit cases have openly questioned the application of such a "higher" standard for omissions in the *Franks* context [*Id*. at 2–3 (citing *United States v. Davis*, 84 F.4th 672, 682 (6th Cir. 2023); *United States v. Hitchcock*, No. 24-1377, 2025 WL 1136180 (6th Cir. 2025))]. Defendants argue that, although the Sixth Circuit has not yet resolved this matter, a higher "intent to mislead" standard is contrary to the "reckless disregard" standard established by *Franks* [*Id*. at 4]. Additionally, defendants argue that (1) there is no substantive difference in terms of the effect on the issuing judge between a "half-truth" and a "falsehood"; (2) at the time Rule 12 pretrial motions are due, a movant will almost never have access to the information necessary to demonstrate an officer's intent; and (3) *Mays* was decided in the context of a civil rights case, not a criminal case [*Id*.].

The government responds that the R&R's quotation from *Mays* regarding an intention to mislead is an accurate statement of the law [Doc. 234, p. 1]. The government states that the Sixth Circuit has "repeatedly held that a defendant must meet a 'higher' standard to invalidate a warrant based on an omission (rather than a false statement)" [*Id*. at 2 (quoting *Davis*, 84 F.4th at 681–82)]. And these precedents cannot be dismissed as "dicta" [*Id*.]. The government acknowledges that there is some inconsistency in the case law regarding how this higher standard has been described [*Id*.]. Nonetheless, the

5

government asserts that the Sixth Circuit has already reconciled the two lines of precedent [*Id.* (citing *Hale v. Kart*, 396 F.3d 721, 726 (6th Cir. 2005))].

The magistrate judge's citation to *Mays* is an accurate statement of the Sixth Circuit law. In *Mays*, the Sixth Circuit stated that "except in the *very* rare case where the defendant makes a strong preliminary showing that the affiant *with an intention to mislead* excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, *Franks* is inapplicable to the omission of disputed facts." 134 F.3d at 816 (emphasis in original). None of the cases defendants cite reject the application of a higher standard for omissions. Specifically, in *Hitchcock*, the Sixth Circuit noted that "[s]ome of our cases have suggested that a defendant must meet a 'higher' intent element when seeking to challenge an affidavit through . . . omissions[,]" but concluded "we need not consider that question here." 2025 WL 1136180, at *4 (citing *Davis*, 84 F.4th at 681–82). *Hitchcock* thus did not alter or reject the "intent to mislead standard," and, indeed, did not even analyze that standard beyond this single sentence of dicta in the opinion. Additionally, in *Davis*, the Sixth Circuit explained:

> Although we have not categorically excluded these types of omissions from the *Franks* inquiry, we have repeatedly held that a defendant must meet a "higher" standard to invalidate a warrant based on an omission (rather than a false statement). *United States v. Neal*, 577 F. App'x 434, 450 (6th Cir. 2014) (quoting *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008)); *see, e.g.*, *United States v. Fisher*, 824 F. App'x 347, 353–54 (6th Cir. 2020); *United States v. Alford*, 717 F. App'x 567, 570 (6th Cir. 2017); *United States v. Martin*, 920 F.2d 393, 398 (6th Cir. 1990). When describing this higher standard, we have sometimes noted that a defendant must prove that an officer omitted the information "with an intention to mislead" (not just with recklessness) and that the omission of the information was "critical to the finding of probable cause[.]" *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998); *see Hale v. Kart*, 396 F.3d 721, 726–27 (6th Cir. 2005). Other

6

times, though, we have suggested that the defendant must show that the officer omitted the information intentionally or with reckless disregard. *See United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001); *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997). If the latter rule applies, it is unclear how we have set a "higher" standard for omissions than the one that governs false statements (as we have said).

*Davis*, 84 F.4th at 681–82. While the Sixth Circuit here recognized some distinction in the phrasing of the relevant standard for omissions, it at least implicated that the "intent to mislead" standard was correct, by emphasizing that "we have repeatedly held that a defendant must meet a 'higher' standard to invalidate a warrant based on an omission," and then noting that, if the "intent to mislead" standard is *not* the rule "it is unclear how we have set a 'higher' standard for omissions than the one that governs false statements (as we have said)." *Id*. Although the *Davis* Court ultimately declined to directly decide the applicable standard, finding instead that the defendant had not made the requisite showing under either standard, *id*. at 682, this dicta suggests that court believed that the "intent to mislead" standard was the applicable standard for omissions. And, since it was decided, the Sixth Circuit has cited *Davis* for the proposition that defendants must meet the "intent to mislead" standard for omissions in the context of a *Franks* challenge. *See United States v. Higgins*, 141 F.4th 811, 817 (6th Cir. 2025) ("[I]f a defendant is trying to show an omission, he must meet an even higher standard: that the officer omitted the information 'with an intention to mislead' and that the omission was 'critical to the finding of probable cause.'" (citing *Davis*, 84 F.4th at 682)).

Additionally, as the government notes, the Sixth Circuit has addressed the different phrasing of the applicable standard for omissions, stating that the "combined holdings" of

7

*Mays* and *Atkin* "instruct district courts that plaintiffs must make a strong preliminary showing that the affiant with an intention to mislead excluded critical information from the affidavit, and the omission is critical to the finding of probable cause." *Hale*, 396 F.3d at 726.

Moreover, the Sixth Circuit continues to rely on the "intent to mislead" standard for omissions. Indeed, within this month, the Sixth Circuit has again noted, in a published opinion, that the "bar is even higher for omissions" in the *Franks* context. *United States v. Richards*, --- F.4th ---, 2026 WL 74037, at *5 (6th Cir. 2026). Specifically, the Sixth Circuit again stated that a defendant "must show that the officer making the affidavit omitted information with the intent to mislead and that those omissions were critical to the finding of probable cause." *Id.* (internal quotation marks omitted) (citing *Higgins*, 141 F.4th at 817). The Sixth Circuit also cited this standard in an unpublished opinion this month. *See United States v. Easter*, No. 25-1248, 2026 WL 18812, at *4 (6th Cir. 2026) (noting that the defendant provided no evidence suggesting that police had an "intention to mislead," and stating that such undercut his *Franks* challenge on the basis of an alleged omission).

This Court is "bound by the controlling Sixth Circuit precedent in the absence of any Supreme Court decision clearly overturning such precedent." *Hollis v. Erdos*, 480 F. Supp. 3d 823, 831 (S.D. Ohio 2020) (internal quotation marks omitted). The application of a higher "intent to mislead" standard to allegations of omissions when evaluating the preliminary showing for a *Franks* hearing is the binding precedent in this circuit.

8

Accordingly, the magistrate judge appropriately applied that standard, and defendants' objections to such are **OVERRULED**.

### 2. OptumRx Audit

In the search warrant affidavit, Agent Joseph Valero, the affiant, stated that OptumRx performed an audit of Rocky Hill Pharmacy ("RHP") for prescriptions and refills filled between January 1, 2020, and May 29, 2020, with claims submitted to Medicaid/TennCare [Doc. 119-1 ¶ 52]. Agent Valero stated that, as part of the audit, OptumRx mailed survey forms to prescribers to confirm whether they actually issued the prescriptions as billed by RHP, and the majority of prescribers responded that they did not authorize a prescription for Lidocaine/HC rectal kits [*Id*. ¶ 54]. As examples, Agent Valero provided copies of the prescriber denial forms from Nurse Practitioner ("NP") Courtney Travis, NP Lindsey Smith, and NP Courtney Carroll [*Id*. at 17–22].[1]

In their motion to suppress, defendants first argue that the government knew from years of investigation that Associated Pain Specialists ("APS") was "non-compliant in countless respects," but Agent Valero affirmatively misled Judge Poplin to believe that RHP was at fault [Doc. 89, p. 15]. Specifically, defendants allege that multiple APS witnesses told the government that prescriptions were being written without providers' authorization [*Id*.]. However, Agent Valero used limited and selective fragments from OptumRx's audit file to create the misimpression, based on prescriber denials, that RHP had billed for medications that had not been prescribed, despite the information from the

---

[1] Apparently, NP Travis, NP Smith, and NP Carroll were all practitioners at Associated Pain Specialists [*See* Sealed Doc. 147, pp. 59–60].

9

investigation of APS "contradict[ing]" those denials [*Id*. at 15–16]. Second, defendants argue that the OptumRx audit file contained documents that showed the prescriber denials were "completely unreliable," specifically, copies of the actual prescriptions these prescribers denied, which showed that the prescriptions had been faxed to RHP [*Id*. at 16].

The government responds that Agent Valero simply recited the facts outlined in OptumRx's report and included screenshots of the prescribers' responses [Doc. 111, p. 11]. The government contends that defendants' arguments about APS do not call into question the truthfulness of Agent Valero's affidavit [*Id*. at 12]. The government asserts that any bad acts by APS do not have any bearing on the reliability of the providers who worked there, nor do they negate the fact that RHP received financial benefit from the "apparent bogus" prescriptions [*Id*.]. Additionally, the government argues that defendants' argument about the faxed copies of prescriptions in OptumRx's file ignores other facts in the affidavit, namely, that at least one faxed prescription was altered without the prescriber's permission [*Id*. (referencing a prescription by NP Ashley Manning that was included in the search warrant affidavit)]. The government contends that the logical inference to be drawn from these facts is that there was a fair probability other faxes had been altered, and the most likely persons to have altered the prescriptions were those who benefited financially from the pharmacy claims [*Id*.].

In reply, defendants reiterate that, by offering the prescriber denials but withholding critical information that APS compliance failures were responsible for these denials, Agent Valero misled Judge Poplin that the claims billed by RHP were fraudulent [Doc. 115, pp. 4–5]. Additionally, defendants highlight that Agent Valero never disclosed the existence

10

of the prescriptions that the providers denied, and by deliberately omitting that the prescriptions (1) existed, and (2) had been faxed to RHP, Agent Valero omitted critical facts that would have "eviscerated" the prescriber denials [*Id*. at 5].[2]

At the first suppression hearing, the government stated that one of the fundamental pieces of the affidavit was conveying to Judge Poplin that the providers said they did not authorize a prescription that RHP billed for, and there is no challenge to the accuracy of Agent Valero's statements about what these providers said [Sealed Doc. 147, p. 34]. Additionally, as to defendants' implication that the APS providers' denials were not reliable because APS office staff were doing things without the providers' knowledge, such does not account for the statements made by NP Manning, NP Felicia Bertram, and NP Alicia Armstrong, none of whom were APS providers, and, as a practical matter, does not make sense [*Id*. at 43]. Specifically, the government argued that nothing in that theory made sense when looking at the motivation of the parties and who actually profited [*Id*. at 44].

Defendants responded that all of the prescriber denials came from APS, with the exception of three: (1) NP Manning, whose prescription was altered in the affidavit, and (2) NP Armstrong and NP Bertram, two providers from Alliance Pain that originally denied prescriptions contained in the Humana audit, but later affirmed them [*Id*. at 59–60].

---

[2] Defendants also raised, for the first time in their reply brief, and in direct response to the government's reliance on NP Manning's statements about alterations to her prescription, that Agent Valero made alterations to the copy of NP Manning's prescription included in the search warrant affidavit [Doc. 115, p. 6]. The Court will address these arguments separately, *infra*.

Defendants stated that the government knew the prescriptions were being sent from APS without the providers' authorization, but did not tell the Court, instead, presenting only the prescriber denials, for the purpose of supporting Agent Valero's accusation that RHP was billing based on fabricated claims and prescriptions that did not exist [*Id*. at 61–62].

In the R&R, the magistrate judge concluded that none of the statements in the affidavit regarding the OptumRx audit were false, and defendants' allegations amounted to a claim that Agent Valero omitted information that investigators and providers suspected that APS staff, particularly Felisha Livesay,[3] were altering or forging prescriptions [Doc. 204, p. 52]. However, the magistrate judge noted that Agent Valero also had evidence that RHP was involved in altering or forging prescriptions, namely, statements from NP Manning, who was not an APS provider, that a prescription she wrote and her office faxed to RHP was changed, and the changes were not in her handwriting [*Id*. at 52–53]. Additionally, Agent Valero had information linking RHP to Livesay [*Id*. at 53 and n.35]. The magistrate judge stated that defendants had arguably shown that Agent Valero was uncertain of RHP's involvement or the extent of RHP's involvement in healthcare fraud early in the investigation [*Id*. at 54]. But, later, Agent Valero had additional evidence beyond the OptumRx and Humana audits, particularly, the information from the interview of NP Manning [*Id*. (citing Doc. 123-1, FBI Report of March 2024 Manning Interview)]. Thus, the magistrate judge concluded that defendants failed to show that Agent Valero

---

[3] Sometimes spelled "Felisha Livezey" [*See* Doc. 212, p. 7]. The Court will use "Livesay" throughout this memorandum opinion and order for the sake of clarity and consistency.

acted with the intent to mislead by omitting the investigation into APS or suspicions about who was involved in forging prescriptions [*Id*.].

### a. Prescriber Denials vs. Prescriptions

In their objections, defendants first argue that the magistrate judge did not address their argument that the inclusion of the prescriber denials was false and misleading because she misunderstood it to relate to the "omission" of exculpatory evidence, i.e., that investigators and providers suspected that APS staff, particularly Livesay, were altering or forging prescriptions [Doc. 212, p. 7]. But defendants assert that the actual prescriptions included in the same audit file make the prescriber denials false and misleading [*Id*. at 5]. Specifically, copies of all the prescriptions that the prescribers denied were included in file, as either faxed or phoned-in prescriptions [*Id*. at 6]. Defendants contend that the Court should find, as the magistrate judge found regarding the Humana audit, that defendants made a substantial preliminary showing that Agent Valero misrepresented the OptumRx prescriber denials in its affidavit [*Id*.].

The government responds that the affidavit explained that in the course of the OptumRx audit, providers had returned surveys stating that they did not authorize various prescriptions for which RHP had billed and included screenshots of four such surveys [Doc. 234, p. 4]. The government argues that the actual prescriptions do not make the provider denials false, or even less suspicious [*Id*.]. To the contrary, such is evidence that someone was altering or forging prescriptions [*Id*.]. Thus, the government contends that the prescriptions are neither a material omission nor evidence that Agent Valero intended to mislead the magistrate judge [*Id*.].

13

It appears that defendants object to the magistrate judge's conclusion that their arguments raise allegations of "omission" rather than "false statements" for purposes of the *Franks* analysis. But the information in the affidavit, that is, that the prescribers returned survey forms denying that they had authorized the prescriptions at issue, is not false. Defendants do not appear to contest that the prescriber denials exist and that they deny authorizing the relevant prescriptions. What defendants actually seek to challenge is the veracity of those prescriber denials. However, *Franks* does not provide an avenue to challenge the veracity of evidence provided to law enforcement, but rather, permits a defendant to challenge the affiant only. *United States v. McCarley-Connin*, 148 F.4th 808, 816 (6th Cir. 2025). Thus, "an 'attack on the veracity' of an informant's statements [does not] satisfy the burden to trigger a *Franks* hearing unless the defendant makes a 'substantial showing that the *affiant's* statements were intentionally or recklessly false." *Id.* (emphasis in original) (quoting *United States v. Rodriguez-Suazo*, 346 F.3d 637, 648 (6th Cir. 2003)). Again, the affiant's statement here was that OptumRx mailed survey forms to prescribers, the majority of those prescribers responded that they did not authorize prescriptions for the Lidocaine/HC rectal kids, and the prescriber denial forms copied into the affidavit were examples of such [Doc. 119-1 ¶ 54]. Even accepting as true defendants' assertions about other evidence in the OptumRx audit file, and even if the Court were to assume that such undermined the veracity of the prescriber denials, defendants have not shown that Agent Valero's statement that the prescriber denial forms in the affidavit were returned as part of the OptumRx audit and that the copies in the affidavit were examples of the returned forms was *false*. Rather, defendants' arguments are appropriately characterized, as the magistrate

14

judge concluded, as a claim that the information provided in the affidavit was misleading due to the omission of other information.

Turning to whether defendants have shown that Agent Valero acted with intent to mislead in omitting copies of the actual prescriptions associated with the prescriber denials from the search warrant affidavit, defendants suggest that the omission is the same as the omission of evidence from the Humana audit file that the magistrate judge found to be, at least arguably, made with intent to mislead [Doc. 212, p. 7; *see* Doc. 204, pp. 56–57]. But the omissions regarding the Humana audit are distinct from the omissions from the OptumRx audit.

Specifically, regarding the Humana audit, Agent Valero included prescriber denials in the affidavit from three practitioners [Doc. 119-1, pp. 23–25]. However, the Humana Special Investigations Unit summary of that audit noted that, of three prescribers who denied services, RHP "was able to mitigate with 2 of the prescriber denials leaving only denials from Courtney Travis" [Doc. 89-9, p. 3]. According to defendants, although NP Bertram and NP Armstrong initially denied the services, they subsequently verified and rewrote the prescriptions at issue [Doc. 89, p. 12]. But none of this information was included in Agent Valero's affidavit [*See* Doc. 119-1]. Judge McCook concluded that this omission of the subsequent mitigation "deprive[d] the issuing judge of the complete import of the denials by these two prescribers" [Doc. 204, p. 57]. And Judge McCook concluded that, given that this mitigation was included in the Humana audit, there was at least circumstantial evidence that Agent Valero intentionally left this later mitigation out of his affidavit [*Id.*].

By contrast, defendants do not suggest that the OptumRx audit specifically noted or found that the prescriber denials were mitigated by the copies of the prescriptions at issue. Instead, defendants argue that these prescriptions could have cast doubt on the veracity of the prescriber denials. But, again, a *Franks* challenge is not the appropriate forum for challenging the veracity of statements provided to law enforcement. *See McCarley-Connin*, 148 F.4th at 816. And, as the Sixth Circuit has noted, "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Mays*, 134 F.3d at 815 (citing *United States v. Colkley*, 899 F.2d 297, 302 (4th Cir. 1990)). Ultimately, the prescription copies from the OptumRx file do not have the same clearly mitigating effect on the prescriber denials as the information about NP Armstrong and NP Bertram's mitigation of their own denials contained in the Humana audit. The Court thus concludes that defendants have not made a substantial preliminary showing that Agent Valero omitted these prescriptions with an intent to mislead.

### b. Investigation of APS

Defendants next contend that the Federal Bureau of Investigation ("FBI") also had extensive investigative information that made Agent Valero's presentation of the OptumRx prescriber denials false and misleading, specifically, information that APS office staff were issuing prescriptions without the knowledge and authorization of APS providers [Doc. 212, p. 7]. Defendants argue that no suspicious facts point to RHP [*Id*. at 9].

The government responds that the magistrate judge squarely addressed, and rightfully rejected, this claim [Doc. 234, p. 4]. The government contends that the

16

magistrate judge correctly stated that the possibility that alterations were happening at APS did not contradict any of the statements in the affidavit [*Id.*]. Moreover, the government states that the search warrant affidavit was not required to include all potentially exculpatory evidence [*Id.*]. Further, the affidavit presented other suspicious facts that pointed to RHP, including a statement from NP Manning, who was not an APS provider, indicating that a prescription she wrote and her office faxed to RHP was changed and the changes were not in her handwriting [*Id.*].[4]

Ultimately, defendants' objections regarding the omission of suspicions about APS providers amounts to a general objection, as defendants largely reiterate their prior argument and do not point to any specific error in the R&R (with the exception of the issue discussed in subsection (c), *infra*). *See Austin*, 2021 WL 1540389, at *4.

Regardless, the Court finds that the magistrate judge properly concluded that defendants have not shown that Agent Valero excluded information regarding APS with intent to mislead, as required for a *Franks* hearing. Contrary to defendants' assertion [Doc. 89, pp. 15–16], the information about APS does not directly "contradict" the prescriber denials. Instead, this information simply provides an alternate explanation for the prescriber denials from APS providers. In other words, information from the investigation of APS, as presented by defendants, provides one possible explanation for the prescriber denials. But it does not entirely rule out the possibility that fraudulent behavior on the part of RHP was a possible explanation for the prescriber denials. This is particularly true when

---

[4] As noted previously, the Court will address the arguments regarding NP Manning's prescription in a subsequent section of this memorandum opinion and order.

considering that a non-APS provider, NP Manning, also alleged that her prescription sent to RHP was altered by someone other than herself.

Considering all of this, the Court concludes that defendants have not made a substantial preliminary showing that Agent Valero omitted information regarding APS from the affidavit with an intent to mislead. Defendants' objections on this ground are thus **OVERRULED**.

### c. Reliance on Material Outside the Affidavit

Next, defendants argue that the magistrate judge relied on evidence outside the search warrant affidavit to establish that Agent Valero had not acted with intent to mislead, specifically citing a November 2021 interview memorandum of Livesay, and a September 2023 interview memorandum of Jimmy Cowden, APS's business consultant [Doc. 212, p. 10]. Defendants contend that it was legal error for the magistrate judge to consider material outside the four corners of the warrant application [*Id.* (citing *McCarley-Connin*, 148 F.4th at 816)].

The government responds that *McCarley-Connin* merely held that the court's determination of probable cause is limited to the facts of the affidavit [Doc. 234, p. 5]. It does not suggest that the court is limited to the four corners of the affidavit when determining whether a *Franks* hearing is appropriate [*Id.*].

Nothing in *McCarley-Connin* indicates that a reviewing judge is limited to the four corners of the search warrant affidavit when evaluating whether a defendant has established that the affiant made false statements or omitted information with intention to mislead in the affidavit for purposes of a *Franks* showing. Instead, *McCarley-Connin* holds that

18

review of a *probable cause finding* is limited to the facts contained within the search warrant affidavit. 148 F.4th at 815. And, in fact, *McCarley-Connin* characterizes *Franks* challenges as an "exception" to the "four-corners principle," stating that "[a] defendant may rebut the presumption for a validly issued warrant by alleging that an affidavit was perjured[.]" *Id.* at 816. Indeed, common sense dictates that a court must necessarily consider information outside of the search warrant affidavit when analyzing whether a defendant has made the preliminary showing required for a *Franks* hearing. How else could a court determine that statements in the affidavit were false or information omitted at all, much less with an intent to mislead? That common-sense principle plays out in this case: in attempting to make the requisite showing for a *Franks* hearing, defendants have asked the Court to consider information outside of the four corners of the affidavit, such as the copies of prescriptions and other information about the FBI's investigation of APS that were omitted from the affidavit. The Court finds no error in the magistrate judge's consideration of evidence outside the search warrant affidavit in evaluating the *Franks* challenge, and defendants' objection is thus **OVERRULED**.

### 3. NP Manning

In his affidavit, Agent Valero stated that on February 20, 2024, agents interviewed NP Manning and showed her a copy of one of the prescriptions for a topical pain cream where she was listed as the prescriber [Doc. 119-1 ¶ 49]. NP Manning confirmed her selection, item 1, included Diclofenac, Baclofen, Cyclobenzaprine, and Ketoprofen, but clarified that the "add-ons" and "substitutions" written on the form were not done by her and were not in her handwriting [*Id.*]. The affidavit then included a copy of the prescription

19

at issue [*Id.* at 14]. The affidavit relayed that NP Manning told agents that she would choose a pain cream option listed on the supplied form and her medical assistant would then fax the prescription to RHP [*Id.* ¶ 50].

As noted previously, defendants argue in their reply brief, in response to the government's reliance on NP Manning's prescription in its briefing, that NP Manning's prescription constitutes another ground for a *Franks* hearing [Doc. 115, p. 6]. Specifically, defendants assert that "**Agent Valero deliberately and intentionally DELETED the fax transmission line from the prescription . . . that is depicted in his affidavit**" [*Id.* (emphasis in original)]. Thus, defendants contend that the FBI's search warrant application was based on documents Agent Valero "doctored and tampered with to conceal the truth" [*Id.*]. Defendants note that the fax transmission line was included in the document RHP produced to Humana as part of the audit, and was included on the copy of the prescription the FBI showed NP Manning during her interview in February 2024, but was removed from the version included in the search warrant affidavit [*Id.*]. Defendants also argue that Agent Valero never mentioned in his affidavit that the prescription had been faxed to RHP by Dr. Jack Scariano's practice, but rather, Agent Valero falsified a new document that would conceal any reference to that fact [*Id.* at 6–7].

At the suppression hearing, the government argued that defendants' argument about the fax header completely misses the point of what the evidence suggests and inclusion of the fax header would not prove anything [Sealed Doc. 147, p. 41]. The government argued that the point of including the prescription in the affidavit is that the prescriber said that what was on that document was not authorized by her [*Id.* at 41–42].

20

Defendants responded that the inclusion of an altered document was an "affirmative misrepresentation" for which Agent Valero should be required to answer questions [*Id*. at 53]. Defendants state that the whole thrust of the affidavit was that RHP and associated individuals were fraudulently billing "out of thin air," thus, the omission of a fax transmission line demonstrating that the prescription had in fact been faxed to RHP undercuts the inference Agent Valero was asking Judge Poplin to draw [*Id*. at 55]. Defendants contend that this omission was deliberate and purposeful [*Id*.].

In the R&R, the magistrate judge concluded that, despite the omission of the fax transmission line from the prescription copy submitted with the affidavit, the affidavit makes clear that the prescription was faxed from NP Manning's place of business to RHP by a member of NP Manning's staff [Doc. 204, p. 58]. Thus, Agent Valero did not falsely represent that the prescription did not exist or was forged by RHP [*Id*. at 59]. The magistrate judge also found that the omission of the fax transmission line was not material to probable cause, given that the affidavit stated that NP Manning's prescriptions were faxed to RHP by her medical assistant [*Id*.].

In their objections, defendants reiterate that the affidavit contains a prescription signed by NP Manning that was altered to remove the facsimile transmission line from that document [Doc. 212, pp. 10–11]. Defendants contend that the magistrate judge misunderstood the significance of the altered prescription [*Id*.]. First, defendants contend that the magistrate judge did not realize that Agent Valero pulled the original prescription from Humana's 2020 audit file [*Id*. at 11]. Rather, the magistrate judge erroneously found that "[l]ater in the investigation . . . Agent Valero had additional evidence beyond the two

21

audits, particularly the information from NP Manning" [*Id.* (citing Doc. 204, p. 54)]. But, contrary to the magistrate judge's understanding, Humana had audited NP Manning's prescription four years earlier, resulting in no findings [*Id.*]. Second, defendants argue that because Agent Valero obtained a copy of the faxed prescription from Humana's audit file, it was impossible to tell whether the notations in the "add on/substitution" section of the prescription were made before or after the prescription was faxed [*Id.* at 11–12]. When interviewed, NP Manning confirmed that she had initialed the prescriptions to authorize RHP to "substitute based on insurance coverage or limitations" [*Id.* at 12]. Thus, rather than establishing a "prescriber denial," NP Manning's interview confirmed that RHP was authorized to dispense the medication and had done nothing wrong [*Id.*].[5]

---

[5] In a footnote, defendants argued that the magistrate judge failed to acknowledge several other ways in which NP Manning's interview directly contradicted Agent Valero's statements [Doc. 212, p. 12 n. 10]. Specifically, defendants assert that NP Manning said that RHP's pre-printed prescriptions were "similar" to those used by another compounding pharmacy, MD Pharmacy, contrary to Agent Valero's conclusory statement that such forms are not common-place in legitimate medicine [*Id.*]. Second, NP Manning told the FBI that she had been instrumental in moving the pain cream prescriptions to RHP, contradicting the FBI's suspicions of an improper referral relationship between Dr. Scariano and RHP [*Id.*]. Third, NP Manning prescribed pain creams as alternatives to opioids, often following other therapies [*Id.*]. Finally, NP Manning stated that patients benefited from the therapies [*Id.*].

The government responds that the fact that RHP's pre-printed prescriptions may have been similar to those used by another pharmacy does not contradict Agent Valero's statement that such forms are not common-place in legitimate medicine [Doc. 234, p. 6]. The government argues that defendants do not identify any specific statement in the affidavit contradicted by NP Manning's statement that she was "part of the decision makers in moving the pain cream prescriptions to RHP," but, regardless, that decision does not preclude "an improper referral relationship between Dr. Scariano and RHP" [*Id.* at 7]. Finally, the government asserts that the fact that NP Manning may have prescribed pain creams as an alternate to opioids or that patients may have benefited from them is irrelevant to whether someone at RHP altered her prescriptions to add additional high-reimbursement medications [*Id.*].

The Court notes that, to the extent that defendants seek to raise these arguments as additional objections to the R&R, including them in a footnote to the objections is not procedurally proper and does not sufficiently notice the Court of their objections. Moreover, despite a diligent review of the entire record in this case, it does not appear that defendants raised these specific

22

The government responds that there is no evidence that Agent Valero intended to conceal the fact that the prescription had been faxed, nor does that fact have any bearing on the probable cause analysis [Doc. 234, pp. 5–6]. As to defendant's argument that the prescription at issue was included in the Humana audit file, the "additional evidence" the magistrate judge referred to was NP Manning's 2024 statement to law enforcement that the prescription had been altered by another hand [*Id*. at 6]. The government contends that defendants have not shown that the magistrate judge "misunderstood" anything [*Id*.]. Third, the government disputes defendants' assertion that NP Manning's interview confirmed RHP was authorized to dispense the medication and had done nothing wrong and directly contradicted Agent Valero's statements [*Id*.]. The government notes that the portion of the prescription purporting to authorize RHP to "substitute based on insurance coverage or limitations" was clearly depicted in the search warrant affidavit, not concealed [*Id*.].

First, defendants misunderstand the magistrate judge's statement that Agent Valero later found evidence beyond the Humana and OptumRx audit files. Although the magistrate judge says this new evidence was "the information from NP Manning" [Doc. 204, p. 54], the magistrate judge specifically cites to the FBI's memorandum from an interview of NP Manning in March 2024 in support of this statement [*Id*.]. Thus, it is clear

---

issues before the magistrate judge. Nonetheless, the Court agrees with the government's position as to each of these alleged inconsistencies and finds that defendants have not shown that the affidavit was false or misleading in these respects. Therefore, any objections on these grounds are **OVERRULED**.

that the "additional evidence beyond the two audits" the magistrate judge was referencing was NP Manning's *interview*, not NP Manning's *prescription*. As a result, that NP Manning's prescription was included in the Humana audit is of no import for purpose of the *Frank*s analysis.

Additionally, although defendants contend that, because this prescription was pulled from the Humana audit file, it is impossible to determine whether the alterations to the prescription were made before or after the prescription was faxed to RHP, such proof of when the alterations were made is not necessary for the purposes of establishing probable cause. *See Kaley v. United States*, 571 U.S. 320, 338 (2014) ("Probable cause, we have often told litigants, is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." (internal quotation marks and alterations omitted)); *United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2007) ("Probable cause . . . does not require any showing that the officer's suspicions prove to be correct or that they are more likely true than false." (internal quotation marks omitted)).

Moreover, that the Humana audit, containing NP Manning's prescription, resulted in no findings is not relevant to the *Franks* analysis. Defendants cite no support for the idea that the federal government is somehow precluded from using evidence collected in a private company's audit simply because that private audit resulted in "no findings."

Case 3:24-cr-00113-TAV-JEM    Document 264    Filed 01/27/26    Page 24 of 63
PageID #: 3596

Further, the Court agrees that omission of the fax transmission line from NP Manning's prescription was not material. The following is a reproduction of NP Manning's prescription that was provided as part of the Humana audit:



[Doc. 123-1, p. 5].

During her interview, NP Manning was shown the following version of the prescription:



[Doc. 123-2, p. 6].  Of note, the blue markings on this version of the prescription were made by NP Manning during the course of her interview [*Id.* at 3].

The following version of the prescription was included in Agent Valero's search warrant affidavit:



[Doc. 119-1, p. 14].

Defendants correctly state that this version of the prescription does not include the fax transmission line, which indicated that the prescription was faxed to RHP on "02/25/2020" at "02:20PM" from "BETTER HEALTH" [*Compare* Doc. 123-1, p. 5; and

Doc. 123-2, p. 6, *with* Doc. 119-1, p. 14]. But defendants have provided no evidence that this omission was made with the intent to mislead. First, it appears most likely that the fax transmission line was inadvertently omitted when the heading indicating that this was a prescription for patient "VK" was added [*See* Doc. 119-1, p. 14]. And, despite defendants' allegations that there is evidence of manipulation of the document from the fact that it is "cock-eyed," [Doc. 212, p. 11], the Court notes that all three versions of the prescription appear to be "cock-eyed," and this does not suggest any intent to mislead by Agent Valero. Moreover, as Judge McCook concluded, there is no indication that Agent Valero intended to mislead the issuing judge about the fact that this prescription was faxed to RHP, as, on the same page of the affidavit as this copy of NP Manning's prescription, Agent Valero relayed NP Manning's statement that her practice was to choose a pain cream listed on the supplied form and her medical assistant "would then fax the prescription over to RHP" [Doc. 119-1 ¶ 50].

Finally, to the extent defendants contend that the prescription is not a true prescriber denial because NP Manning confirmed that she authorized substitutions based on insurance coverage or limitations, that information was contained on the face of the prescription included in the search warrant affidavit, and was therefore presented to the issuing magistrate judge. To the extent that defendants are now asserting that NP Manning's prescription does not support a finding of probable cause for this reason, the Court concludes that NP Manning's statement that her prescription was altered by someone other than herself, combined with the other evidence presented in the affidavit, was sufficient to support a finding of probable cause.

28

For these reasons, the Court finds that defendants have not shown that Agent Valero acted with an intent to mislead in omitting the fax header from this prescription in the search warrant affidavit. Accordingly, defendants' objections regarding NP Manning are **OVERRULED**.

### 4. Intent to Mislead as to Waiver of Patient Copays

In the search warrant affidavit, Agent Valero alleged, among other things, that there was probable cause to believe that RHP had engaged in an unlawful scheme to waive patient copays in violation of the Anti-Kickback Statute [Doc. 119-1 ¶ 6]. According to Agent Valero, Medicare requires providers, including pharmacies, to collect copayments from beneficiaries prior to or soon after the service or item is provided [*Id.* ¶ 27]. Agent Valero stated that it is a felony for a provider to routinely waive copayments "absent specific exceptions" [*Id.* ¶ 28 (citing 42 U.S.C. § 1320a-7b(b) and Medicare Claims Processing Manual, Ch. 23, § 80.8.1)]. The affidavit states that RHP submitted 3,533 claims for keto10/1mit2/dico1% pain cream between August 27, 2019, and December 29, 2023, but did not collect a copayment on 2,191 of those claims [*Id.* ¶ 86]. Agent Valero also stated that "[w]itnesses told agents that RHP did not collect copays from them" [*Id.* ¶ 88]. Specifically, patient A.B. said they "did not remember" paying a copay for the pain cream [*Id.* ¶ 88(a)]. Additionally, patient D.N. said they "could not recall" paying a copay for the pain creams [*Id.* ¶ 88(b)].

In their motion to suppress, defendants argue that, in hopes of finding evidence of bribes paid by RHP to prescribers, the FBI "concocted a 'kickback' theory that would get them in the door," namely, the waiver of patient copays [Doc. 89, pp. 19–20]. First,

29

defendants argue that Agent Valero claimed that, when patients incur a copay, Medicare requires pharmacies to collect them, but this is an inaccurate statement of law [*Id*. at 20]. Instead, the U.S. Department of Health and Human Services, Office of Inspector General ("OIG") has long permitted providers to waive patient copays based on an individualized assessment of financial need [*Id*.]. Second, defendants argue that Agent Valero claimed that data from RHP's internal payment system showed RHP had not collected patient copays on 62% of its claims for a particular medication covered by a Medicare prescription drug plan, but this is because no copayments were due, not because RHP waived collection to bribe patients [*Id*.]. Defendants contend that Agent Valero "failed to articulate even the most rudimentary understanding of how co-insurance for Medicare patients works" [*Id*.]. Defendants assert that Agent Valero stated that his allegations are based on a review of RHP's claims data from RHP's pharmacy software, but that data shows that both A.B. and D.N. paid copayments of $3.40 and $3.60, respectively, on various dates [*Id*. at 21]. Defendants assert that the FBI was clearly acting in bad faith [*Id*. at 22].

The government responds that defendants' "hyper-technical" arguments are not a proper basis for overturning a magistrate judge's probable cause determination [Doc. 111, p. 15].

In reply, defendants note that the government did not dispute that Agent Valero's sworn statements regarding RHP's involvement in a scheme to violate the Anti-Kickback Statute through co-pay waivers are, at minimum, inaccurate, which defendants contend is dispositive of the suppression motion [Doc. 115, pp. 2, 4].

At the first suppression hearing, the government asserted that a simple reading of the paragraphs of the search warrant affidavit regarding copays shows that Agent Valero did not make an untrue statement [Sealed Doc. 147, p. 45]. He recounted data about the payment of copays but acknowledged that some patients paid copays [*Id*.]. Agent Valero simply restated accurately what witnesses said and did not draw conclusions; defendants have not shown any of that to be untrue [*Id*.].

Defendants replied that the FBI's allegation is simply that there was not a collection of copays but that is not the same as a waiver of copays [*Id*. at 57]. A waiver is an affirmative action, and a simple failure to collect is not a violation [*Id*.].

In the R&R, the magistrate judge found that defendants failed to show that the information in the affidavit regarding copays was false [Doc. 204, p. 61]. Agent Valero acknowledged in the affidavit that RHP collected some copays [*Id*.]. The magistrate judge determined that defendants' citation to some copays paid by A.B. and D.N. did not negate Agent Valero's assertion that witnesses told agents that RHP did not collect copays from them [*Id*.]. Additionally, data provided by defendants regarding copays collected from A.B. and D.N. supports Agent Valero's assertion that review of RHP's payment system shows RHP did not collect copays for two-thirds of prescriptions and refills for a pain cream for patients with Medicare [*Id*.]. Specifically, the magistrate judge noted that defendants' own chart showed that A.B. did not pay a copay two-thirds of the time, and D.N. did not pay a copay a little less than one-half of the time [*Id*. at 61–62]. Thus, the magistrate judge concluded that the affidavit showed that RHP regularly, not occasionally, waived copays for this pain cream [*Id*. at 62].

31

Turning to defendants' arguments regarding exceptions to Medicare's requirement to collect copays, the magistrate judge stated that, because Agent Valero alleged routine waiver of copays, the exception to the copay requirement defendants cite would not apply [*Id.*]. Moreover, the magistrate judge noted that courts must review probable cause findings in a "commonsense" not "hypertechnical" manner, and defendants' citation to the exception permitting copay waivers did not persuade the magistrate judge that Agent Valero's statements were false, much less deliberately or recklessly so [*Id.*].

Finally, the magistrate judge concluded that the affidavit provided probable cause for violation of the Anti-Kickback Statute by showing that RHP routinely did not collect copays for Medicare patients [*Id.* at 63–64]. The magistrate judge noted that the Anti-Kickback Statute expressly states actual knowledge or specific intent by the entity is not required [*Id.* at 64].

### a. Misinterpretation of Anti-Kickback Statute

In their objections, defendants argue that the magistrate judge misinterpreted the law applicable to a violation of the Anti-Kickback Statute, finding that "actual knowledge of specific intent by the entity is not required" [Doc. 212, p. 13 (citing Doc. 204, p. 64)]. Defendants argue that this is an incorrect statement of law, as the government must prove that a defendant (1) knowingly and willfully offered or paid remuneration (2) to induce that person to refer an individual (3) for the furnishing of any item or service for which payment may be made under a federal healthcare program [*Id.*]. Agent Valero failed to allege any facts that would give rise to probable cause to believe RHP violated the Anti-Kickback

32

Statute [*Id*. at 14].[6]  The "remuneration" at issue, i.e., the copay, was not paid to a "person to refer an individual" for anything [*Id*.].  In fact, the Anti-Kickback Statute requires that the unlawful remuneration be paid to the physician, who is the healthcare decisionmaker in a position to make a "referral" of the patient [*Id*. (citing *United States v. Montgomery*, No. 20-5891, 2022 WL 2284387 (6th Cir. June 23, 2022))].  Defendants argue that research has revealed no case law in which anyone has been criminally prosecuted for patient copay waivers standing alone, likely because there are a number of scenarios in which the law authorizes a provider to waive patient co-pays [*Id*.].  Further, the search warrant does not allege any facts establishing that RHP violated the Anti-Kickback statute "knowingly and willfully," that is, telling a patient that RHP would waive the applicable copay if the patient used the pharmacy to fill his or her prescription [*Id*.].

The government responds that defendants incorrectly assert that the magistrate judge misinterpreted the applicable law, as the magistrate judge directly and accurately quoted the Anti-Kickback Statute's "knowingly and willfully" requirement, as well as statutory language providing that "actual knowledge of this section or specific intent to commit a violation" is not required [Doc. 234, p. 7].  The government also asserts that the statute does not require that the unlawful remuneration be paid to the physician, and, in fact, the case to which defendants cite specifically states that the statute can reach non-physicians as well [*Id*. at 7–8 (citing *United States v. Sorenson*, 134 F.4th 493, 500

---

[6] Defendants' arguments in this regard are a challenge to probable cause, rather than a *Franks* challenge.  Nonetheless, the Court will address this argument here to follow the organization of the objections [*See* Doc. 212, pp. 13–14].

(7th Cir. 2025))]. Moreover, the statute does not require RHP to have told a patient RHP would waive the applicable copay, but rather, covers offers of remuneration made directly or indirectly [*Id*. at 8].

"To establish a violation of the anti-kickback statute, the government must prove that a defendant (1) knowingly and willfully offered or paid remuneration (2) to induce that person to refer an individual (3) for the furnishing of any item or service for which payment may be made under a federal healthcare program, 42 U.S.C. § 1320a-7b(b)(2), or that a defendant (1) knowingly and willfully solicited or received remuneration (2) in return for referring an individual to a person (3) for the furnishing or arranging for the furnishing of any item or service for which payment may be made under a federal healthcare program, 42 U.S.C. § 1320a-7b(b)(1)." *Montgomery*, 2022 WL 2284387, at *12.[7]

First, to the extent that defendants are asserting that the magistrate judge did not cite these elements of an offense under the Anti-Kickback Statute, that assertion is belied by the record. In the R&R, the magistrate judge specifically quoted the direct language of the Anti-Kickback Statute, including the *mens rea* language, requiring that the acts be committed "knowingly and willfully" [Doc. 204, p. 63 (quoting 42 U.S.C. § 1320a-7b(b)(1)(A)-(B)). Additionally, to the extent that defendants contest the accuracy of the magistrate judge's statement that "the Anti-Kickback Statute expressly states the

---

[7] Notably, defendants quote only the portion of this sentence relating to the elements of a violation of § 1320a-7b(b)(2) [Doc. 212, p. 13]. But the affidavit generally alleges probable cause of a violation of the Anti-Kickback Statute, citing § 1320a-7b, and no specific subsection [Doc. 119-1 ¶¶ 4, 6].

34

actual knowledge or specific intent by the entity is not required," [Doc. 204, p. 64], the magistrate judge cites and accurately quotes subsection (h) of the Anti-Kickback Statute. *Compare* Doc. 204, p. 64, *with* 42 U.S.C. § 1320a-7b(h) (both stating that "[w]ith respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section"). Defendants have not shown how the magistrate judge's quotation of a subsection of the Anti-Kickback Statute is an incorrect statement of the law.

Defendants allege that the Anti-Kickback Statute requires that the unlawful remuneration be paid to the physician, citing *Montgomery*, *Sorenson*, and *United States v. Khalil*, No. 22-cr-20200, 2025 WL 1921758 (E.D. Mich. July 11, 2025) [Doc. 212, p. 14].[8] First, nothing in the *Montgomery* decision stated that remuneration must be paid by physicians, or, indeed, addressed remuneration at all beyond stating the elements of a violation of the Anti-Kickback Statute. *Montgomery*, 2022 WL 2284387, at *12.[9] Next,

---

[8] Notably, at the suppression hearing, defendants appeared to have taken a different position, stating that "if there were a showing that Rocky Hill Pharmacy deliberately, knowingly and intentionally waived patient co-pays for government program beneficiaries, that, in theory, is sufficient to allege a crime under the anti-kickback statute" [Sealed Doc. 147, p. 107; *see also id.* at 108 ("[I]f he had been able to support the allegations of waiver, deliberate and knowing waivers of co-pay, arguably that does constitute a federal violation, a specified federal crime")]. To the extent that defendants now contest that copay waivers could not constitute a violation of the Anti-Kickback Statute because the remuneration would not be paid to providers, any error in the R&R could be deemed invited error. *See United States v. Akridge*, 62 F.4th 258, 264 (6th Cir. 2023) ("[A] party may not generally complain on appeal of errors that he himself invited or provoked the court to commit" (internal quotation marks and alterations omitted)). Nonetheless, the Court finds no error in the R&R's application of the Anti-Kickback Statute.

[9] While defendants allege that they are aware of no case where "anyone has been criminally prosecuted for patient copay waivers standing alone" [Doc. 212, p. 14], the Court does note that, in *Montgomery*, the Sixth Circuit found ample *mens rea* to support a violation of the Anti-Kickback

35

rather than supporting defendants' assertion that remuneration must be paid by physicians, the *Sorenson* court explicitly stated the opposite: "The statute can reach non-physicians, as well, although such cases seem to be much less common among those prosecuted." 134 F.4th at 500.

In *Khalil*, the Eastern District of Michigan stated that, for purposes of the Anti-Kickback Statute, "the person receiving the kickback must be the same person who makes the referral[.]" 2025 WL 1921758, at *5. But that court also noted that "courts have shown some flexibility in interpreting the language of the [Anti-Kickback Statute], to ensure that the statute is not circumvented through a payment to a non-physician that produces a referral where the 'payee leverage[s] fluid, informal power and influence over healthcare decisions." *Id*. (citing *Sorenson*, 134 F.4th at 599). And "[s]everal cases have endorsed that reading of the statute, to bring within its reach kickbacks that produce referrals through the use of undue influence or other improper conduct over third parties." *Id*. The court then noted that this approach was recently endorsed by the Fifth Circuit in *United States v. Cockerell*, 140 F.4th 213 (5th Cir. 2025). *Id*. at 6. The *Khalil* court summarized *Cockerell* as follows:

> There, the court affirmed an [Anti-Kickback Statute] conviction of a marketer who was paid commissions based on medicinal cream prescriptions that he secured from physicians, which were billed to a federal insurance program. Although the defendant was a marketer who did not make healthcare decisions, he was culpable because he intended to induce referrals from physicians who prescribed the cream by "intend[ing] improperly to influence those who make healthcare decisions on behalf of patients." He 'showered physicians with lavish vacations and expensive dinners to

Statute, citing, amongst other facts, that defendant was helping pay customers copays. *Montgomery*, 2022 WL 2284387, at *12.

36

encourage them to continue writing prescriptions . . ." – which 'incentives were crucial," because if the doctors were not paid, the defendant's company "would have no business."

*Id.* (internal citations omitted). In *Khalil*, the district court noted that the government had eschewed any theory that the markets had improper influence over physicians, and thus, the requirements of the Anti-Kickback Statute were not established. *Id.* at 7.

Ultimately, *Khalil*'s holding does not support a finding that there was insufficient probable cause for a violation of the Anti-Kickback Statute in the search warrant affidavit in this case. Notably, the search warrant affidavit does contain some allegations over improper influence over physicians. The affidavit recounted that Sydney Goodson, a former pharmacy technician at RHP, told law enforcement that RHP had a sales representative that went to various doctor's offices and took doctors to lunch to "talk about the pain contracts" [Doc. 119-1 ¶¶ 73, 75]. The affidavit also recounted that RHP's own website advertised "Lunch & Learn for Providers," in which they promised to "cater a nice meal at [the provider's] office" to "discuss ways that we can work together to help your patients" [*Id.* ¶ 80]. Given this information, the Court finds that, at the search warrant stage, there was sufficient evidence to find probable cause of a violation of the Anti-Kickback Statute.

Accordingly, the Court finds that the magistrate judge did not misinterpret the requirements of the Anti-Kickback Statute, and defendants' objection is thus **OVERRULED**.

37

### b. Failure to Establish Purported Waived Copays Were Due

Defendants next argue that, under Medicare, sometimes a patient is obligated to pay a copay, and other times not [Doc. 212, p. 14]. But a copay must be due to be waived [*Id*.]. Nonetheless, Agent Valero's affidavit never alleged that patient copays were due on any of the 2,191 claims at issue [*Id*.]. Defendants allege that, in fact, Agent Valero knew, based on his review of RHP's pharmacy data, that none of the 2,191 claims had a copay obligation [*Id*. at 15].

The government responds that defendants' suggestion that a copay may not have been due on the 2,191 claims mentioned in the affidavit is no more than a statement that the facts set forth in the affidavit might have an innocent explanation [Doc. 234, p. 8]. And probable cause does not require officers to rule out innocent explanations for suspicious facts [*Id*. (citing *United States v. Tagg*, 886 F.3d 579, 586 (6th Cir. 2018))]. Further, for purposes of the *Franks* inquiry, defendants have not identified any false statements in the affidavit in this regard [*Id*.].

As an initial matter, defendants' argument as to whether copays were due does not appear to relate to their request for a *Franks* hearing, but rather, goes to probable cause only, as defendants do not allege that Agent Valero's statement that records showed RHP did not collect a copayment on 2,191 claims is false or misleading. Rather, defendants contest whether an inference of criminal conduct can be drawn from such statement. Ultimately, the Court agrees with the government that defendants' argument amounts to an assertion that there was an innocent explanation for these suspicious facts—namely, that copays were not collected on these claims because copays were not due, rather than because

38

copays were waived. *See United States v. Tagg*, 886 F.3d 579, 586 (6th Cir. 2018) ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." (internal quotation marks omitted)). Accordingly, defendants' objection in this regard is **OVERRULED**.

### c. Routine Waiving of Copays Based on Plan/Medication

Next, defendants argue that the magistrate judge erred in finding that the FBI had shown that RHP "routinely" did not collect Medicare copays [Doc. 212, p. 15]. Instead, Agent Valero's allegations relate exclusively to a single Medicare Part D plan offered by United Healthcare under the Secure Horizons brand [*Id.*]. Defendants suggest that if RHP were "regularly" waiving copays for Medicare beneficiaries, it would not make sense to limit that practice to one drug and one plan [*Id.* at 15]. Additionally, contrary to his false waiver allegations, Agent Valero knew from the OptumRx and Humana audits that RHP had not waived patient copays on any of the audited prescriptions [*Id.*]. Both audit files contained the prescription labels with the patients' insurance information, any applicable copay, and cashier receipts with copay charges and methods of payment [*Id.*]. Neither audit found copay waivers; to the contrary, Humana's audit expressly found "[a]ll member that had a copay, paid the copay" [*Id.*]. Finally, defendants contend that the non-collection of 3% of copays is hardly evidence of a "routine" practice to support probable cause that RHP violated the Anti-Kickback Statute [*Id.*].

The government responds that, while defendants attach screenshots from RHP's data system listing "$0" as the copay "paid" on various prescriptions for A.B. and D.N., this is not inconsistent with A.B. and D.N.'s representation that they did not pay copays

39

[Doc. 234, p. 8]. Nor is it clear from those screenshots why no copay was collected, whether it was that no copay was due or whether RHP waived it in some fashion [*Id.* at 8–9]. Moreover, even if the screenshots established that no copay was due for these prescriptions, defendants have provided no reason to think that Agent Valero was aware of that information [*Id.* at 9].

First, defendants have not shown that Agent Valero's affidavit contained any false statement regarding copay waivers. Defendants reference "false waiver allegations," but, beyond the title of the heading itself ("Co-pay Waivers") nothing in the section of the affidavit recounting non-collection of copays directly uses the phrase "waiver" [Doc. 119-1, p. 32]. Defendants seem to allege that Agent Valero's inference of copay waivers was inherently false because the OptumRx and Humana audits found no copay issues. But, as discussed previously, defendants have provided no case law indicating that the federal government is hamstrung by a private company's audit findings in investigating potential criminal violations. Moreover, it is not clear from defendants' argument that all (or even any) of the 2,191 claims referred to in the affidavit fell within the limited scope of the OptumRx or Humana audits. Thus, defendants have not shown that Agent Valero knew that none of the 2,191 claims for which no copay was collected had not been the subject of a copay waiver, and thus, defendants have not made a substantial preliminary showing that Agent Valero's statements were false.

Turning to defendants' challenge to probable cause, it is unclear how defendants' assertion that the affidavit's allegations relate only to a specific Medicare Part D plan would affect the probable cause analysis. Defendants cite no law suggesting that routine

40

waiver of copays would be permissible if limited to one specific Medicare plan. And, to the extent defendants challenge this evidence by asserting that it would not make sense to limit such "routine" behavior to a specific plan, this argument is well beyond the scope when reviewing an issuing judge's probable cause determination. *See United States v. Sanders*, 106 F.4th 455, 461 (6th Cir. 2024) ("The district court must employ 'great deference' when considering the issuing judge's probable cause determination" and "should 'overturn that decision only if the [issuing judge] arbitrarily exercised' the judge's authority."); *Tagg*, 886 F.3d at 585–86 (noting that probable cause only requires a probability or substantial chance of criminal activity, not an actual showing of such activity, and officers are not required to rule out innocent explanations for suspicious facts). Finally, as to defendants' argument that the 2,191 claims are only approximately 3% of their total claims, and therefore, any waiver is not "routine," this argument misses the point that the allegation forming probable cause is that defendants engaged in a scheme to waive copays for a specific group, e.g., those covered by a specific Medicare plan.

For all these reasons, defendant's objection is **OVERRULED**.

### d.    Misrepresented Claim Data[10]

Defendants contend that the magistrate judge's finding that citation to some copays paid by patients did not negate Agent Valero's assertion that "witnesses told agents that RHP did not collect copays from them" was clear error [Doc. 212, p. 16]. Defendants first

---

[10] In this section of their objections, defendants also allege misrepresentative patient information regarding patient M.U. However, because the discussion of patient M.U. does not align with the other evidence regarding an alleged violation of the Anti-Kickback Statute, discussed in this section, the Court will address it separately, *infra*.

note that the patients only stated that they "did not remember" or "could not recall" paying copays, not that "RHP did not collect copays" [*Id*.]. Second, defendants argue that the data Agent Valero reviewed contains a summary of each claim and shows that the patients' insurance required no copay on the dates in question [*Id*.]. Thus, defendants contend that Agent Valero misrepresented that copays were "waived" even though he knew that no copays were due on those claims [*Id*.].

The government responds that none of the statements pointed to by defendants contradict what is in the affidavit, nor do they make the facts alleged any less suspicious [Doc. 234, p. 9].

First, to the extent defendants point to language that patients A.B. and D.N. only stated that they "did not [] remember" or "could not recall" paying copays to RHP, that language from A.B. and D.N. is directly included on the face of the search warrant affidavit [Doc. 119-1 ¶ 88]. Thus, there can be no allegation that Agent Valero intended to mislead with these statements. Moreover, to the extent that defendants allege that Agent Valero's statement that "[w]itnesses told agents that RHP did not collect copays from them" is false, because the examples provided are the statements from A.B. and D.N., even assuming this discrepancy in phrasing could be deemed a "false statement," the Court finds that Agent Valero's statement that witnesses said RHP did not collect copays is not necessary to a finding of probable cause, as the direct statements of A.B. and D.N. would have supported probable cause, regardless.

Second, as noted previously, Agent Valero did not state that A.B. and D.N.'s copays were "waived." He merely created such an inference by alleging that witnesses reported

42

not paying copays to RHP. Accordingly, there is no false statement regarding waiver of copays.

As to defendants' argument regarding data showing copays were paid, the magistrate judge directly addressed the documentation provided by defendants, finding that it showed A.B. did not pay a copay two-thirds of the time, and D.N. did not pay a copay a little less than one-half of the time [Doc. 204, pp. 61–62]. Defendants have not shown how that assessment of the documentation was incorrect.

Moreover, Agent Valero never stated that A.B. and D.N. never paid copays. Instead, Agent Valero merely repeats what A.B. and D.N. told law enforcement. And, again, a *Franks* challenge cannot be used to contest the veracity of an informant's information. *See McCarley-Connin*, 148 F.4th at 816. Thus, the Court finds that defendants have not made a substantial preliminary showing that Agent Valero's statements in this regard were false.

### 5.    Misrepresentation of Patient Files Revealed After Briefing

Defendants contend that on June 24, 2025, after Defendant Haney filed her supplemental brief, the government produced additional discovery that revealed further misstatements by Agent Valero [Doc. 212, p. 17]. Specifically, in his affidavit, Agent Valero claims that Dr. Scariano, through his attorney, produced the medical records of certain patients and RHP submitted claims for a number of prescriptions for these patients, but Dr. Scariano's files did not include corresponding prescriptions for several claims [*Id*.]. The government's June 24, 2025, production, however, clarified that Dr. Scariano did not produce anything, and that, instead, an electronic medical records ("EMR") service

43

provider produced the files [*Id*.].  Defendants contend that this is a material misrepresentation [*Id*. at 18].  Defendants suggest that it is possible Dr. Scariano switched EMR providers, rendering the chart notes incomplete following the transition [*Id*.].  Additionally, the representation that Dr. Scariano had produced the records improperly bolstered the reliability of those files [*Id*.].  Defendants suggest that, had the issuing judge known that the production was not made by Dr. Scariano, she would have questioned whether the FBI had access to the physical files, not simply whatever was uploaded to an EMR [*Id*.].

The government responds that there is nothing inconsistent about the statements that "Dr. Jack Scariano through his attorney . . . produced the medical records of some of his patients, including patients M.U. and R.D." and that medical charts were produced by "Advanced MD, Jack E. Scariano, Jr. M.D.'s electronic medical records provider" [Doc. 234, pp. 9–10].  Moreover, aside from speculation that Dr. Scariano switched EMR providers, defendants provide no reason to think that the source of Dr. Scariano's records would be material to the probable cause analysis [*Id*. at 10].

The two statements at issue are as follows.  In the affidavit, Agent Valero stated: "In relation to another case and in response to compulsory service, Dr. Jack Scariano, through his attorney, D.E., produced the medical records of some of his patients" [Doc. 119-1 ¶ 59].  In a subsequent letter producing discovery, the government described the discovery as: "the medical charts produced by AdvancedMD, Jack E. Scariano, Jr. M.D.'s electronic medical records provider" [Doc. 212-5, p. 2].  Defendants essentially seem to assert that Agent Valero's statement that Dr. Scariano produced medical records was false

44

because the medical records were actually produced by Dr. Scariano's EMR provider. But the statement in the affidavit is not "false" simply because it does not identify the EMR service Dr. Scariano used to produce his patient files. And, regardless, even if the statement was false, the Court finds that Agent Valero's statement that Dr. Scariano produced the files, versus a statement that an EMR provider produced the files, was not necessary to a finding of probable cause. In other words, whether Dr. Scariano or Dr. Scariano's EMR provider produced the medical records is not material to the probable cause determination. Accordingly, the Court finds that defendants have not shown that a *Franks* hearing is warranted on this additional ground.

### 6.    Patient M.U.

In the search warrant affidavit, Agent Valero noted that Dr. Jack Scariano produced medical records of patients, including M.U. [Doc. 119-1 ¶ 59]. Agent Valero stated that M.U.'s file contained visit date notes from February 28, 2018, to December 16, 2021 [*Id*. ¶ 60]. However, M.U.'s appointments scheduled for August 23, 2022, and January 10, 2023, were cancelled, and not attended by the patient, respectively [*Id*.]. M.U.'s patient file also contained two RHP prescription sheets, one dated June 16, 2021, including 6 refills, and one undated, including 6 refills [*Id*. ¶ 61]. However, RHP submitted claims for 6 separate prescriptions, each with a number of refills, for M.U. with Dr. Scariano listed as the provider, including prescriptions on: (1) June 16, 2021, with 5 refills, (2) November 26, 2021, with 3 refills, (3) March 28, 2022, with 3 refills, (4) August 18, 2022, with 3 refills, (5) January 3, 2023, with 2 refills, and (6) April 13, 2023, with 5 refills [*Id*. ¶ 62].

45

Agent Valero noted that these prescriptions were submitted by RHP despite the fact that M.U. did not attend a patient appointment with Dr. Scariano after December 16, 2021 [*Id*.].

Agent Valero recounted that on January 23, 2024, the FBI interviewed M.U., who stated that they had not been to an appointment with Dr. Scariano in 2 or 3 years [*Id*. ¶ 65]. M.U. stated that they had been prescribed a topical pain cream during a prior visit with Dr. Scariano, and they received 2 or 3 bottles of the pain cream in the mail about every 30 days from RHP [*Id*.]. M.U. stated that the pain cream helped with cramps, but they did not use it often, resulting in unused pain cream bottles [*Id*.]. Despite not needing all of the pain cream received, the cream continued to arrive in the mail every 30 days through sometime in 2023 [*Id*.].

In their objections, defendants argue that Agent Valero misrepresented the FBI's interview of patient M.U. by not disclosing that M.U. told the FBI that they were receiving prescription "refills" and "never called RHP to cancel the prescription," as well as that M.U. "recently had the prescription transferred to Muncey's Pharmacy," which "helped [them] sometimes when [they] would get cramps" [Doc. 212, pp. 16–17].

Notably, defendants did not raise these specific arguments in their motion to suppress [Doc. 89]. However, at the first suppression hearing, defendants indicated that they needed additional documentation regarding Dr. Scariano's patient files [Sealed Doc. 147, p. 110]. The Court will presume that these arguments are based on subsequent production of evidence and will address this argument in the first instance.

In support of their objections, defendants attached a copy of an FBI report from the interview of M.U. on January 23, 2024 [Doc. 212-4]. That report contains four statements

46

which defendants appear to allege were material omissions from the affidavit: (1) M.U. stated that the pain creams "helped [them] sometimes when [they] would get cramps"; (2) M.U. "recently had the prescription transferred to Muncey's Pharmacy"; (3) M.U. "never called RHP to cancel the prescription"; and (4) M.U. stated that their "refills continued coming in the mail" [*Id.* at 2–3].

First, it is unclear how omission of the fact that M.U. believed the pain cream helped with their cramps evidences any intent to mislead by Agent Valero. Indeed, it is unclear how such information would be relevant to the probable cause determination at all. The affidavit clearly indicates that Dr. Scariano's file contained two prescriptions for the pain cream for M.U. [Doc. 119-1 ¶ 62]. Accordingly, there appears to be no dispute that Dr. Scariano did, at some point, find the pain cream appropriate for M.U., prescribed it to them, and it would have been proper for RHP to dispense the pain cream to M.U. consistent with that prescription. However, defendants cite no case law indicating that RHP would somehow be authorized to submit additional claims for the pain cream for M.U., beyond the refills authorized in those prescriptions, simply because M.U. benefitted from the pain cream. Thus, M.U.'s statement that they benefitted from the pain cream is not material and does not indicate that Agent Valero attempted to mislead the issuing judge.

Second, as to M.U.'s statement that they recently had the pain cream prescription transferred to Muncey Pharmacy, this statement does appear to indicate that M.U. had an ongoing prescription for the pain cream, beyond the two prescriptions contained in Dr. Scariano's file. But nothing in the report of M.U.'s interview indicates that the ongoing prescription was from Dr. Scariano. Rather, the report simply reflects that M.U. "recently

47

had the prescription transferred to Muncey's Pharmacy" [Doc. 212-4, p. 2]. The Court ultimately finds that the omission of M.U.'s statement that they had a prescription transferred to another pharmacy does not evidence an intent to mislead on the part of Agent Valero, nor is it material to probable cause.

Finally, to the extent that M.U. told the FBI that they never called RHP to cancel the prescription, and that what they continued receiving in the mail were "refills," these statements do not undercut any of the information in the affidavit. The affidavit reflected that RHP submitted six different prescriptions for M.U., each with a number of refills [Doc. 119-1 ¶ 62]. Accordingly, defendants have not shown any intent to mislead about the fact that some of the pain creams M.U. received every 30 days were "refills." Moreover, defendants have not explained how the fact that M.U. did not call to cancel the prescription would indicate any intent to mislead regarding the alleged discrepancy between the number of prescriptions in Dr. Scariano's file and the number of prescriptions submitted by RHP.

Accordingly, the Court finds that defendants have not made the required showing for a *Franks* hearing as to these alleged omissions. Defendants' objections are therefore **OVERRULED**.

### B. Probable Cause

The Court begins briefly with a reiteration of the legal framework set out by the R&R regarding Fourth Amendment protection:

> The Fourth Amendment protects individuals against unreasonable searches or seizures of "their persons, houses, papers, and effects[.]" U.S. Const. amend IV. It requires that law enforcement have probable cause and obtain a search warrant before searching a residence or a cellular telephone. *Collins v. Virginia*, 584 U.S. 586, 593 (2018) ("At the [Fourth] Amendment's very

48

core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (citation omitted & modified)); *Riley v. California*, 573 U.S. 373, 400 (2014) (holding the search of a cell phone requires a search warrant). . . .

The Fourth Amendment protection against warrantless searches extends to "commercial premises," *Mancusi v. DeForte*, 392 U.S. 364, 367 (1968), but "[a]n expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home," *New York v. Burger*, 482 U.S. 691, 700 (1987) (citation omitted).  An individual enjoys the protection of the Fourth Amendment in his or her place of business if "the area was one in which there was a reasonable expectation of freedom from governmental intrusion."  *DeForte*, 392 U.S. at 368 (citation omitted). "The business[wo]man, like the occupant of a residence, has a constitutional right to go about h[er] business free from unreasonable official entries upon h[er] private commercial property."  *See v. Seattle*, 387 U.S. 541, 543 (1967); *see also Burger*, 482 U.S. at 699 (holding that the owner of a business in a closely-regulated industry has a reduced expectation of privacy); *Dow Chem. Co. v. United States*, 476 U.S. 227, 236 (1986) (observing "Dow plainly has a reasonable, legitimate, and objective expectation of privacy within the interior of its covered buildings"); *c.f.*, *Autoworld Specialty Cars, Inc. v. United States*, 815 F.2d 385, 388–89 (6th Cir. 1987) (holding a defendant had no expectation of privacy in an auto showroom open to the public to browse and make purchases).

[Doc. 204, pp. 36–37].

As stated previously, when evaluating a search warrant, the Court "must employ 'great deference' when considering the issuing judge's probable cause determination." *Sanders*, 106 F.4th at 461 (quoting *United States v. Christian*, 925 F.3d 305, 311–12 (6th Cir. 2019) (en banc)).  "[I]t is of no moment whether the district court would have likewise issued the same warrant[;]" rather, "what matters is whether the issuing judge had a 'substantial basis for concluding that a search would uncover evidence of wrongdoing.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (cleaned up)).  And in making this determination, the Court considers the information that was before the issuing judge, i.e.,

49

"the four corners of the affidavit[.]"  *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010).

The supporting affidavit to a search warrant "should be reviewed in a commonsense—rather than a hypertechnical—manner, and the court should consider whether the totality of the circumstances supports a finding of probable cause, rather than engaging in line-by-line scrutiny."  *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004) (citing *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001)); *accord Gates*, 462 U.S. at 235–36.  In *District of Columbia v. Wesby*, the Supreme Court further explained that a "divide-and-conquer approach is improper" because "[a] factor viewed in isolation is often more 'readily susceptible to an innocent explanation' than one viewed as part of a totality."  583 U.S. 48, 62 (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)); *accord Taggs*, 886 F.3d at 585–86.  Ultimately, the "'totality of the circumstances' requires courts to consider 'the whole picture.'"  *Wesby*, 583 U.S. at 60 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)); *accord Christian*, 925 F.3d at 312 (noting that courts are required "to look holistically at what the affidavit does show, instead of focusing on what the affidavit does not contain, or the flaws of each individual component of the affidavit").

The Court further notes that, time and time again, the Supreme Court has emphasized that "[p]robable cause 'is not a high bar'" to clear.  *Wesby*, 583 U.S. at 57 (quoting *Kaley*, 571 U.S. at 338); *accord Christian*, 925 F.3d at 311 (describing the character of the probable cause standard as "undemanding").  Probable cause "requires

50

only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 462 U.S. at 243 n.13.

As a preliminary matter, defendants allege that the magistrate judge erroneously relied on challenged portions of the warrant to uphold the probable cause determination [Doc. 212, p. 22]. Defendants state that the magistrate judge was thus obligated to exclude challenged materials from the probable cause analysis [*Id*. (citing *United States v. Wright*, 635 F. App'x 162, 169 (6th Cir. 2015); *United States v. Knox*, No. 3:19-cr-65, 2020 WL 7405796 (E.D. Tenn. Dec. 17, 2020))].

The government responds that the magistrate judge was not required to ignore every portion of the affidavit that defendants challenged [Doc. 234, p. 12]. Rather, only after a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit, that the court must reconsider the affidavit without the disputed portions [*Id*.]. Absent a finding that the affidavit included an intentional false statement or material omission, the mere fact that defendants challenged certain evidence as false and misleading does not require the Court to ignore those portions of the affidavit [*Id*.].

Defendants' argument appears to presuppose that the Court will find that they have made a substantial preliminary showing that false statements were made in the search warrant affidavit. The case law that defendants cite specifically states that, under *Franks*, a defendant is entitled to a hearing after making a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the warrant in the affidavit, and that, "*[i]f this burden is met, the court must*

51

reconsider the affidavit without the disputed portions and determine whether probable cause still exists." *Wright*, 635 F. App'x at 169 (emphasis added). Similarly, the undersigned's decision in *Knox* hinged on the fact that the magistrate judge had determined that the defendant had met his burden on the first prong of *Franks*. 2020 WL 7405796, at *4–5.

Here, the Court has now concluded that, with the exception of the prescriber denials from NP Armstrong and NP Bertram, defendants have not made a substantial preliminary showing of a false statement or an omission made with the intent to mislead. Accordingly, the Court is not required to excluded all challenged evidence from the affidavit in determining whether probable cause existed to support the search warrant.

Turning to the probable cause determination, defendants raise a slew of objections, much of it highly technical, to each individual allegation in the search warrant affidavit [Doc. 212, pp. 19–21].

The government responds that judges are not to engage in an excessively technical dissection of the record when determining probable cause, and facts must be considered together, not apart [Doc. 234, p. 11]. Additionally, the government argues that probable cause only requires a probability or substantial chance of criminal activity, not an actual showing of such activity [*Id*. at 11–12]. Thus, probable cause does not require ruling out innocent explanations for suspicious facts, but rather, the inquiry involves the degree of suspicion that attaches to particular types of noncriminal acts [*Id*. at 12].

First, the Court declines to engage in a line-by-line scrutiny of the search warrant affidavit to determine whether each individual allegation supported a finding of probable

cause.  *See Woosley*, 361 F.3d at 926 (stating that the "court should consider whether the totality of the circumstances supports a finding of probable cause, rather than engaging in line-by-line scrutiny").  And even if some of the parts of the affidavit might be criticized, the Court finds that, after considering the facts together and paying great deference to the issuing judge, the search warrant for RHP was supported by probable cause.  As Judge McCook stated in the R&R:

> Agent Valero's affidavit . . . shows that multiple providers from multiple practices denied writing prescriptions for compounded medications filled at RHP.  NP Manning stated that a prescription her practice faxed to RHP was altered in someone else's handwriting, and she did not authorize RHP to modify her prescriptions.  Dr. Scariano's patient M.U. continued to receive monthly refills of a pain cream from RHP years after M.U.'s last appointment with Dr. Scariano.  Agent Valero, based on his training and experience, stated that pharmacies benefit financially from submitting forged prescriptions or altering prescriptions to substitute higher-reimbursed drugs or to include refills.
>
> The affidavit also shows that former RHP employee Sydney Goodson stated Defendants Haney, Warren, and Roper submitted test claims to discover which ingredients afforded the maximum reimbursement.  She also described RHP's marketing lunches with providers to promote their "pain contracts," and providers with pain contracts prescribed RHP's pain creams regardless of medical necessity.   RHP's website promoted "Lunch & Learn" opportunities for providers.  Ms. Goodson said RHP also used pre-printed prescription forms to encourage physicians to send patients to RHP for pain creams.  Agent Valero stated that in his experience, pre-printed prescription forms are not common in legitimate medicine.  According to Ms. Goodson, Defendant Roper would place patients on automatic refills for pain creams even if not requested.  Patient G.T. received monthly text messages from RHP for refills for several years after Dr. Scariano stopped prescribing the pain cream at his request and after he repeatedly declined the refills.
>
> In addition, data analysis of RHP's claims for Medicare reimbursement show a large number of claims for a high-reimbursement pain creams for patients with Medicare and only minimal claims for other payors for this same pain cream.  Similarly, RHP sought reimbursement from Medicaid/TennCare for high-reimbursement rectal kits until Medicaid began rejecting those claims,

53

and then RHP began submitting claims for a different high-reimbursement pain cream. RHP failed to collect patient copays for two-thirds of the prescriptions and refills for a pain cream for which it made Medicare claims over . . . four years and four months.

[Doc. 204, pp. 66–67]. Considering all of these facts together, the Court agrees that this evidence is sufficient to establish probable cause. Accordingly, defendants' objection is **OVERRULED**.

### C. Search of Cell Phones

In their suppression motion, defendants also challenge the search of their personal cell phones that was conducted during the execution of the search warrant for the RHP premises [Doc. 185, p. 3].

### 1. Scope

In the R&R, Judge McCook concluded that the search warrant for RHP expressly reached mobile phones of the owners or employees on the premises [Doc. 204, p. 73]. Attachment A to the search warrant permits the search of the premises of RHP, and Attachment B permits the seizure and search of "all records" relating to violations of the target offenses [*Id.*]. Attachment B specifies 11 categories of "records and information" that agents can seize, including "records and information relating to the identity of persons who . . . communicated with [RHP] and its owners and employees about matters related to the Target Offenses" and "records and information related to communications with patients regarding prescription refills" [*Id.*]. Attachment B defines "records" and "information" to include "any form of computer or electronic storage," and further defines "computer" to include "mobile phones" [*Id.*]. Accordingly, Judge McCook concluded that the search

warrant permitted the search of defendants' cell phones for the 11 categories of records [*Id.* at 73–74].

In their objections, defendants contend that the magistrate judge failed to acknowledge that Attachment "A" to the search warrant limited the search to the RHP premises, not cell phones in individuals' pockets [Doc. 212, p. 23]. Moreover, to the extent that the FBI wanted to search those phones, black letter law required a warrant [*Id.*].

The government responds that, while defendants argue that the seizure and search of the phones "required a warrant," the agents here had a warrant, and Attachment B of the search warrant affidavit authorized the search and seizure of "[a]ll records" found on the premises relating to the target offenses [Doc. 234, p. 13]. The term "records" was defined to include "any form of computer or electronic storage," and the term "computer" defined to include "mobile phones" [*Id.* at 14]. The government contends that it does not matter that the warrant was limited to RHP premises as there is no dispute the phones were seized on those premises [*Id.*].

Defendants' objection appears to misunderstand the R&R. Their assertion that black letter law requires a warrant is inapposite. The point of the magistrate judge's analysis is that there *was* a search warrant, and defendants' cell phones fell within the scope of the warrant's language. To the extent defendants argue that the search warrant was limited to a search of RHP's premises, based on Attachment A to the affidavit, several issues arise. First, there is no dispute that the cell phones were seized and searched at RHP's premises, not any other location. Second, Attachment B to the search warrant is labeled "Property to Be Searched and Seized" [Doc. 119-1, p. 43]. And, as the magistrate

55

judge correctly pointed out, Attachment B references 11 categories of "[r]ecords and information [*Id*. at 43–44], defines "records" and "information" to include "any form of computer or electronic storage," and defines "computer" as including "mobile phones" [*Id*. at 44]. Thus, the Court is in agreement with the magistrate judge about the scope of the search warrant. Defendant's objection on this ground is **OVERRULED**.

### 2.    Nexus

For a search warrant to issue, an affidavit must show a likelihood that (1) the items sought are seizable by virtue of being connected with criminal activity and (2) the items will be found in the place to be searched. *United States v. O'Connor*, 723 F. App'x 302, 307 (6th Cir. 2019) (internal citations omitted). A supporting affidavit must, therefore, sufficiently demonstrate the existence of a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)). Such connection must be specific and concrete, and not "vague" or "generalized." *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (citing *Carpenter*, 360 F.3d at 595). "Whether an affidavit establishes a proper nexus is a fact-intensive question resolved by examining the totality of circumstances presented." *Id*.

In the R&R, the magistrate judge concluded that the search warrant affidavit did not provide a sufficient nexus between defendants' personal cell phones and healthcare fraud or violations of the Anti-Kickback Statute [Doc. 204, p. 78]. The magistrate judge noted that the affidavit contains no references of RHP owners or employees using personal cell phones to conduct business at RHP [*Id*.]. The affidavit twice mentions communications

56

by telephone call or text but provides no details that would suggest that these calls or text messages were made by an owner or employee's personal phone [*Id*. at 78–79].   The magistrate judge noted that the affiant also did not state that, in his experience investigating healthcare fraud, evidence was likely to be on personal cell phones [*Id*. at 79].   The magistrate judge concluded that the affiant's statement that RHP stores records electronically does not create a fair probability that the personal cell phones of RHP owners and employees would contain evidence of the alleged crimes [*Id*.].

The government objects to this finding regarding nexus [Doc. 211, p. 1].   The government contends that the affidavit established a fair probability that fraud was occurring at RHP [*Id*. at 1–2].   It also established a fair probability that evidence of the fraud would be found on electronic media associated with the pharmacy [*Id*. at 2–3].   Finally, the affidavit established reasonable grounds to believe that the defendants' phones were the type of electronic media on which evidence was likely to be found, as the affidavit explicitly stated that "computer" it sought to search included "mobile phones" [*Id*. at 3].   Further, the affidavit established a tight connection between the defendants, the pharmacy and the alleged fraud [*Id*.].   The affidavit stated that Defendant Haney and Defendant Warren were co-owners of the pharmacy, and Defendant Roper was a pharmacy employee [*Id*.].   It also explained that Defendant Haney, Defendant Roper, and another pharmacy, employee were not only colleagues, but sisters, which increased the likelihood they communicated by phone [*Id*.].   The affidavit presented evidence that Defendant Haney and Defendant Warren had also chartered private jet flights, purchased luxury lake-side property, and generally lived outside the means of legitimate pharmacists [*Id*.].   Those

57

interlinking connections between the fraud, the business, and each other established at least a fair probability that the defendants' phones would contain communications "with Rocky Hill Pharmacy and its owners and employees about matters related to the Target Offenses" [*Id*. at 3–4].[11]

As an initial matter, the R&R did not find that there was no probability of fraud at RHP or that evidence of that fraud would be found on electronic media associated with the pharmacy. Instead, the issue is whether the affidavit established a sufficient connection between the alleged fraud occurring at the pharmacy and defendants' personal cell phones.

Notably, the government does not point out any references to the defendants' use of personal cell phones in the search warrant affidavit. Instead, they ask the Court to infer the nexus between the defendants' cell phones and the alleged fraud based on facts regarding the relationship between the defendants. But the government cites no case law indicating that, without any mention of the use of personal cell phones in the affidavit, a court could simply infer that defendants used their personal cell phones in connection with the target offenses. To quote a sister district: "While probable cause involves a practical, common sense decision, these arguments from the government rely on some generous inferences." *United States v. Lavallis*, 515 F. Supp. 3d 686, 692–93 (E.D. Mich. 2021) (declining to determine whether a sufficient nexus was alleged, because the good faith exception applied regardless, but stating that the affidavit which made "no mention of any communications

---

[11] The government notes, however, that the Court need not reach this issue if it concludes that the officers relied on the warrant in good faith, which is an independent ground for denying suppression [Doc. 211, p. 4].

58

involving [the] cell phone . . . is close to falling on the wrong side" such that the court cautioned that "in the future, an affidavit should contain more").

The Court agrees with the magistrate judge's determination that a sufficient nexus between the target offenses and defendant's personal cell phones is not present in the affidavit. Accordingly, the government's objection to the R&R is **OVERRULED**.

### 3. Good Faith Doctrine

Under the good faith exception to the exclusionary rule, "[i]n the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Leon*, 468 U.S. 897, 926 (1984). The Court thus must decide "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's decision." *Id*. at 923 n.23. The good faith exception does not apply in four situations:

> (1) when the affidavit supporting the search warrant contains a knowing or reckless falsity; (2) when the magistrate who issued the search warrant wholly abandoned his or her judicial role; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; or (4) when the warrant is so facially deficient that it cannot reasonably be presumed valid.

*United States v. McPhearson*, 469 F.3d 518, 525 (6th Cir. 2006) (citing *Leon*, 468 U.S. at 922–23 n.23).

Evidence may not be admitted at trial if it was seized under a warrant that was issued on the basis of a "bare bones" affidavit, that is, an affidavit that merely "states suspicions,

59

beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *Id*. at 525–26 (quoting *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996)). The Sixth Circuit has found the good faith exception applicable in cases where the affidavit contained a minimally sufficient nexus between the illegal activity and the place to be searched. *Id*. at 526.

Although the magistrate judge concluded that the search warrant affidavit did not allege a sufficient nexus between the defendants' personal cell phones and the target offenses, she nonetheless concluded that the evidence from those cell phones was not subject to suppression because the agents executed the search warrant in good faith [Doc. 204, p. 84]. First, Judge McCook noted that the affidavit is not "bare bones" as to the search of the premises, but rather, is a 40-page affidavit that provides ample probable cause to believe that evidence of healthcare fraud, making false statements in relation to healthcare matters, and violations of the Anti-Kickback Statute would be in the records on RHP's premises, which include electronic records [*Id*. at 81]. The affidavit mentioned that (1) an RHP pharmacy technician called patients to ask about refills and (2) a patient received monthly texts from RHP regarding refills [*Id*.]. Judge McCook concluded that these two references to the use of phones in procuring patient refills, in combination with the affidavit's request to search records on the premises, including "other storage media" provided a slim "modicum" of evidence linking the evidence sought and the defendants' cell phones on the premises [*Id*.]. As a result, the executing agents' belief that defendants' cell phones would contain evidence of the target offenses was more than a mere guess, and

the executing officers thus seized and searched defendants' cell phones in good faith [*Id.* at 81–82].

Judge McCook also rejected defendants' argument that Agent Valero assisted in the execution of the search warrant and knew the affidavit did not authorize the search of personal cell phones [*Id.* at 82–83]. Judge McCook noted that the inquiry is an objective one, rather than a subjective one [*Id.* at 82]. Moreover, the record contains no evidence that Agent Valero did not believe the search warrant authorized him to search employee cell phones, but rather, he came with a CART unit prepared to extract data from cell phones and electronic devices [*Id.* at 82–83].

Defendants object that the facts here do not make out a good faith mistake [Doc, 212, p. 24]. Instead, the FBI required individuals to not only hand over their personal cell phones but also to provide their passwords to enable the FBI to gain access to that private and confidential information without a warrant [*Id.*]. Defendants argue that there was no probable cause to believe the personal phones at issue contained evidence of a crime, and therefore, there is no basis to deem the unlawful searches within the "good faith" exception [*Id.*].

The government responds that defendants assert that the seizure and search of the phones "required a warrant," but the agents here had a warrant [Doc. 234, p. 13]. As to defendants' argument that there was no probable cause to believe that the personal phones at issue contained evidence of a crime, the government states that this conflates the good-faith inquiry with the probable cause inquiry [*Id.* at 14]. The affidavit was not "facially deficient" and suppression is unwarranted [*Id.*].

61

Defendants' objections do not truly address the good faith inquiry. First, to the extent that defendants highlight that they were required to both turn over their phones and provide their passwords "without a warrant," as the Court discussed *supra*, a search warrant did exist and the face of that warrant specifically covered mobile phones at the RHP premises. Defendants present no argument as to why or how the executing officers could not have relied on that language in the search warrant to, in good faith, believe the search of defendants' personal cell phones was authorized.

Moreover, defendants' argument that there was no probable cause to believe that their personal cell phones contained evidence of a crime does not support defendants' conclusion that there is no basis to deem the search a "good faith" exception. The Court has already determined, *supra*, that the search warrant affidavit did not contain a sufficient nexus between defendants' personal cell phones and the target offenses. But that conclusion is not determinative of the good faith analysis. Rather, at this stage, the Court is presented with the question of whether, objectively, a reasonably well-trained officer would have known the search was illegal, despite the magistrate judge's issuance of a search warrant. *See Leon*, 468 U.S. at 923 n.23. Defendants have raised no argument as to why a reasonably well-trained officer would have believed that the search of defendants' personal cell phones was illegal, despite the issuance of a search warrant contemplating the search of "mobile phones" on the RHP premises.

Further, as the magistrate judge stated, the affidavit is not bare bones and makes some references to the use of phones in connection to the target offenses [Doc. 204, pp. 81–82], and the Court is in agreement that the search warrant affidavit was sufficient to

62

provide a reasonably well-trained officer with the good faith belief that a search of defendants' personal cell phones was legal.

Accordingly, defendants' objections are **OVERRULED**.

## IV. Conclusion

For the reasons above, the Court **ACCEPTS** and **ADOPTS** the R&R [Doc. 204] in whole and **GRANTS** Defendant Warren's and Defendant Haney's motions to join [Docs. 96, 172, 177], **DENIES** Defendant Roper's motion to join [Doc. 138], and **DENIES** the motions to suppress evidence [Docs. 89, 165]. Defendant Warren and Defendant Roper's motions to join Defendant Haney's objections [Docs. 215, 221] are **GRANTED**, but both Defendant Haney's and the government's objections to the R&R [Docs. 211, 212] are **OVERRULED**. Defendants' motion to file documents relating to their objections under seal [Doc. 213] is **GRANTED**, and the proposed sealed documents [Docs. 214, 214-1, 214-2] shall be filed under seal.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE